IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JAMES MYERS,**                                    Case No. 1:18 CV 2

    Plaintiff,

    v.                                              Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                  MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff James Myers ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned reverses the decision of the Commissioner and remands for further proceedings.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in October 2014 (Tr. 193) and for SSI in December 2014 (Tr. 206). In both applications, Plaintiff alleged a disability onset date of December 5, 2012. (Tr. 193, 206). His claims were denied initially and upon reconsideration. (Tr. 121, 132). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 144). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on August 3, 2016. (Tr. 10). On October 3, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 10-20). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on January 2, 2018. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in 1969, making him 43 years old on his alleged onset date. *See* Tr. 193. He graduated from high school (Tr. 44) and lived with his wife and daughter (Tr. 41-42). He testified his last job was as a roller in 2013 for a company making fiberglass truck hoods. (Tr. 44-46). That job lasted less than eight months. (Tr. 45). He also previously worked as a "worm", loading pipe into an oil drilling rig; as a pallet builder; and as a fuser, welding plastic pipe to lay gas lines. (Tr. 44-49).

At the August 2016 hearing, Plaintiff told the ALJ he quit his job when he could no longer "roll the fiberglass out". (Tr. 45). He said his hands "don't really work", and that he began losing feeling in his hands more than one-and-a-half years ago. (Tr. 50). He also testified neck and leg problems prevented him from working. (Tr. 49-50). Plaintiff needed assistance to open a can of pop, and he could not distinguish grains of rice from pins by touch since the hand numbness began. (Tr. 50-51). He also struggled to keep his grip, leading him to drop things. (Tr. 51). Plaintiff needed assistance putting on socks and shaving. (Tr. 58).

Plaintiff's constant, aching leg pain began at the same time his hands went numb, he testified. (Tr. 51). He had difficulty walking for about six months, but out of embarrassment delayed using the cane until the previous two or three months. (Tr. 52). He needed the cane to prevent falls, even when standing still. *Id.* Plaintiff testified that he could no longer walk around the block as he could prior to the onset of leg pain. (Tr. 53).

A tumor in Plaintiff's neck caused a shock in his hands if he tilted his head forward toward his chest. (Tr. 53-54). That was an ongoing problem for the prior three to four months. (Tr. 54). He also testified his multiple sclerosis ("MS") caused fatigue, and symptoms flared with increased activity or hot weather. (Tr. 57-58). A few times a month, bad days kept Plaintiff confined to his bed for the day. (Tr. 54). Plaintiff did not clean dishes or do other household cleaning but testified he could do laundry and take out the trash. (Tr. 55-56).

Plaintiff said he would not drive further than a mile down the road; he could fish on a good day, though he struggled to hold onto the fishing pole. (Tr. 43-44). He previously could mow the lawn on a riding mower but stopped three months prior to the hearing. (Tr. 55). He could feed his dogs but not walk them. (Tr. 43).

Relevant Medical Evidence

In February 2012, Plaintiff saw Michael Peterson, a physician's assistant in his primary care doctor's office, to have his blood sugar levels checked. (Tr. 452).[1] Plaintiff's blood glucose test was normal. (Tr. 455). Plaintiff returned to Mr. Peterson in September 2012 complaining of low back pain radiating down his right leg. (Tr. 448). He diagnosed a lumbar strain and prescribed anti-inflammatory medicine, a muscle relaxant, and a heating pad. (Tr. 450-51).

In December 2012, around his alleged onset date, Plaintiff went to the emergency room believing he was having a heart attack. *See* Tr. 436. Testing revealed otherwise, and he was diagnosed with musculoskeletal chest pain. *See* Tr. 436, 437. At a follow-up visit, Mr. Peterson diagnosed anxiety, bronchitis, and angina pectoris. (Tr. 439-40). He prescribed Atenolol, aspirin, anti-anxiety medication, and an antibiotic. (Tr. 440). Plaintiff returned to Mr. Peterson on December 17, with continued complaints of chest pain and adding severe leg cramps and a cough

---

1. Michael Namey, D.O., is Plaintiff's primary care doctor. *See, e.g.,* Tr. 452.

to his list of ailments. (Tr. 431). He prescribed an inhaler. (Tr. 434). Two days later, Plaintiff told Mr. Peterson his chest felt better but his leg cramps continued. (Tr. 427).

In January 2013, Plaintiff told Mr. Peterson he had an episode of sharp chest pain after work. (Tr. 422). Mr. Peterson diagnosed reactive airway disease and prescribed an inhaler. (Tr. 424-25). He also told Plaintiff to be off work until cleared, since work might exacerbate the condition. *Id.* Plaintiff returned one week later, reporting fatigue, joint pain, and muscle weakness. (Tr. 419). Later in January, Plaintiff told Dr. Namey he felt much better and sought release to return to work. (Tr. 412). Dr. Namey noted Plaintiff's reactive airway disease had improved and recommended regular exercise. (Tr. 415-16).

In September 2013, Plaintiff saw Mr. Peterson for medication refills. (Tr. 406). He complained of frequent leg cramps. (Tr. 407). Mr. Peterson, after an examination, noted Plaintiff had full range of motion in all joints. (Tr. 408). He prescribed Flexeril for Plaintiff's leg cramps. (Tr. 409).

In March 2014, Plaintiff returned to Mr. Peterson for a prescription refill, while also complaining of frequent diarrhea. (Tr. 401). Imodium gave Plaintiff some relief, and Mr. Peterson diagnosed him with irritable bowel syndrome. (Tr. 402, 404). He prescribed medications and encouraged starting or continuing an exercise program. (Tr. 404).

In May 2014, Plaintiff returned to Dr. Namey's office complaining of sinus congestion, a cough, and facial pain. (Tr. 395). Plaintiff told Mr. Peterson he had not been checking his blood sugar because the testing strips were very expensive. (Tr. 396). Mr. Peterson prescribed Amoxicillin to treat Plaintiff's sinusitis. (Tr. 399).

In June 2014, Plaintiff returned to Dr. Namey's office twice complaining of hand and feet numbness. (Tr. 383, 388). At his first June visit, Plaintiff had been out of medicine for one week,

and had not started checking his blood glucose levels. (Tr. 389). Mr. Peterson diagnosed neuropathy and told Plaintiff to restart his medications. (Tr. 391-92). At his second visit later in June, Plaintiff said the numbness was getting worse and caused him to fall down. (Tr. 385). Dr. Namey noted decreased sensitivity to soft touch and motor weakness in his arms and legs. (Tr. 387). Plaintiff appeared anxious to Dr. Namey, who diagnosed Plaintiff with neuropathy, ordered an EMG test of his arms and legs and a cervical MRI, and prescribed gabapentin. *Id.*

In July 2014, Plaintiff's MRI revealed a non-specific spinal cord lesion at the C-2 level. (Tr. 344). His EMG test revealed very mild bilateral carpal tunnel syndrome. *See* Tr. 321.

Plaintiff saw Dr. Namey in August 2014 to discuss these test results. (Tr. 378). Plaintiff was "doing well at this time", *id.*, but noted continued numbness, tingling, and weakness in his hands (Tr. 380). Dr. Namey referred Plaintiff to a neurosurgeon. (Tr. 382).

Plaintiff saw neurologist Leonard Weinberger, M.D., in August 2014. (Tr. 319). Plaintiff sought treatment for progressive hand and arm numbness, which had advanced into his forearms. *Id.* He denied any neck pain or trauma. *Id.* On examination, Dr. Weinberger found Plaintiff's gait, muscle strength, and stance normal. (Tr. 320). His sensation to touch, pinprick, and vibration were all intact. *Id.* Dr. Weinberger found Plaintiff had brisk reflexes, and one to two beats of clonus at both ankles. *Id.* Dr. Weinberger reviewed the cervical MRI, noting a ring-enhancing lesion in the spinal cord which he suspected was a tumor. (Tr. 321).[2] Dr. Weinberger noted Plaintiff had clinical signs of myelopathy and recommended he see a neurosurgeon. *Id.*

In September 2014, an MRI of Plaintiff's brain showed a solitary focus of white matter changes in the left frontal lobe and an abnormal signal in the upper cervical spinal cord. (Tr. 331).

---

2. Later notes from Dr. Weinberger show a neurosurgeon evaluated the mass and considered it atypical for a tumor. (Tr. 337).

An MRI of the thoracic and lumbar spines were normal, but a second cervical spine MRI showed a nonspecific intramedullary lesion at C-2 with peripheral enhancement. (Tr. 333-35).

Plaintiff had a lumbar puncture in October 2014, which showed no evidence of leukemia or lymphoma but revealed other abnormalities. (Tr. 277-78). Dr. Weinberger, after reviewing the test results, believed Plaintiff had transverse myelitis or MS. (Tr. 337). Dr. Weinberger referred Plaintiff to an MS specialist. *Id.*

Later in October 2014, Plaintiff followed up with Cynthia Novotny, a physician's assistant in Dr. Namey's office, who told him he needed a new doctor because Dr. Namey had died. (Tr. 348, 350). Plaintiff was to begin a high-dose steroid treatment for transverse myelitis and needed to learn to use a sliding scale for insulin. (Tr. 348). The physician's assistant noted Plaintiff's motor weakness and decreased grip and sensation to light touch. (Tr. 351).

Plaintiff started primary care treatment with Pazhaniaandi Tirounilacandin, M.D., in October 2014. (Tr. 553). Dr. Tirounilacandin diagnosed transverse myelitis and prescribed gabapentin (Tr. 557). He also diagnosed hypertension, which was under suboptimal control, and recommended regular aerobic exercise. *Id.* Dr. Tirounilacandin also noted diagnoses of diabetes, GERD, and anxiety, the last of which was controlled with Ativan. (Tr. 551-52). Plaintiff complained to Dr. Tirounilacandin of numbness, tingling, and weakness in his hands prior to the steroid treatment. (Tr. 553).

In December 2014, Plaintiff returned to Dr. Tirounilacandin, complaining of pain in his arms, neck, and upper back. (Tr. 534). He rated the pain a nine out of ten and requested pain medication. (Tr. 534, 543). Plaintiff said he was not using a cane or other assistive device and had not fallen in the last six months. (Tr. 543). Dr. Tirounilacandin prescribed hydrocodone-

acetaminophen and said he would refer Plaintiff to pain management if the pain worsened. (Tr. 540).

In January 2015, Plaintiff returned to Dr. Tirounilacandin to follow up on his blood glucose levels. (Tr. 525). Plaintiff reported no difficulty dressing, bathing, walking, climbing stairs, or doing errands alone. (Tr. 533). He also reported his pain as nine out of ten in severity. *Id.* His extremities were non-tender. (Tr. 530). Dr. Tirounilacandin described Plaintiff's hypertension as under good control and continued to recommend regular aerobic exercise. *Id.*

In March 2015, Plaintiff saw MS specialist Mary Willis, M.D. (Tr. 487). Plaintiff still complained of numb fingertips, but the numbness in his hands and arms improved after the steroid treatment. *Id.* He also complained of neck and back pain and reported two falls in the last month while refusing to use a cane. (Tr. 487, 492). He additionally complained of fatigue, memory loss, irritability, and imbalance. (Tr. 487). On examination, Dr. Willis noted mild muscle spasticity in Plaintiff's arms but no spasticity in his legs, with full muscle strength in all limbs. (Tr. 488-89). Despite finding no spasticity in Plaintiff's legs, Dr. Willis noted spasticity interfered with hand function and ambulation. (Tr. 488). She diagnosed Plaintiff with relapsing remitting MS, noting Plaintiff's symptoms could improve with medication and physical therapy but noted his wife's concerns regarding compliance. (Tr. 487, 489). Plaintiff did some dexterity exercises at home but did not go to occupational therapy. (Tr. 487). Dr. Willis prescribed Aubagio, which required insurance approval before starting the medication. (Tr. 489).

Later in March 2015, Plaintiff attended an occupational therapy evaluation. (Tr. 569). He said his balance fluctuated daily and he used a cane at home as needed but embarrassment kept him from using one in public. (Tr. 571). The examiner noted Plaintiff had decreased strength in his arms and legs with decreased range of motion and difficulty walking with frequent falls. (Tr.

572). He struggled with stairs, had a short stride, and a right foot drop with occasional foot dragging which increased his risk of falling. (Tr. 571). Plaintiff subsequently missed five appointments and was discharged in May 2015. (Tr. 765). The therapist noted his strength was between three and four on a five-point scale. *Id.*

In April 2015, Plaintiff told Dr. Tirounilacandin that Vicodin was helping his pain. (Tr. 507). Dr. Tirounilacandin referred Plaintiff to pain management, which he began the following month. (Tr. 507, 747).

A May 2015 lumbar spine MRI was normal. (Tr. 762).

Also, in May 2015, Plaintiff told Cynthia Campbell, the nurse practitioner managing his pain, that his medicine helped, and he did not take it on days when he did not need it. (Tr. 747). Ms. Campbell noted Plaintiff's slow but normal gait and decreased sensation in his arms. (Tr. 748). She found Plaintiff's strength diminished in all limbs with a decreased lumbar range of motion. (Tr. 749). She prescribed Percocet but discontinued gabapentin. (Tr. 750-51). Ms. Campbell noted similar findings in June 2015. (Tr. 732). In July 2015, Plaintiff complained of nausea and vomiting from the Percocet, and the pain kept him from sleeping. (Tr. 714).

In June 2015, Plaintiff returned to Dr. Willis. (Tr. 771). He told Dr. Willis Aubagio caused him no side effects and he preferred it to past therapies. *Id.* He found physical therapy helpful and continued to do exercises at home. *Id.* He reported he fatigued quickly, and Dr. Willis noted moderate fatigue. (Tr. 771-72). He had no leg or arm spasticity and full muscle strength. (Tr. 773). Plaintiff's tandem walking was impaired but had normal balance and gait. *Id.* Dr. Willis restarted the gabapentin and described his MS as "clinically stable". *Id.*

Plaintiff returned to therapy in June 2015 but stopped going in August 2015 because insurance no longer reimbursed the cost of the visits. *See* Tr. 767. The therapist noted Plaintiff was

motivated and cooperative during their meetings. *Id.* Plaintiff's strength, endurance, and balance fluctuated on a daily basis while his pain continued in both legs at a seven out of ten level, with muscle tingling and spasms. *Id.*

In September 2015 Plaintiff had a brain MRI, which showed no new MS lesions. (Tr. 780). Dr. Willis noted Plaintiff had trouble remembering to take medications and experienced other memory problems. (Tr. 787-88). Plaintiff had continued low back and leg pain and used a cane to treat imbalance. *Id.* He could only walk 1,000 feet before stopping due to pain. *Id.* Spasticity improved but was troublesome in the mornings. (Tr. 788). Dr. Willis noted diminished vibration sensitivity in the ankles and decreased sensitivity to pinprick in a stocking/glove distribution. (Tr. 789). Plaintiff also had continued neuropathic pain in his hands, legs, and feet, which Dr. Willis thought might be worsened by a prescription. *Id.* Dr. Willis recommended changing his prescription to a longer-acting dose to avoid memory-related noncompliance. (Tr. 790).

In December 2015, Plaintiff returned to Dr. Tirounilacandin to check on his diabetes. (Tr. 652). He noted Plaintiff's diabetes was uncontrolled without complications. (Tr. 656).

In March 2016, Plaintiff told Dr. Willis his medication was not causing side effects, but he continued to have neck pain and impaired coordination and hand strength. (Tr. 797). He also complained he had trouble finding words, and with his memory, and that he could not concentrate or maintain attention well. (Tr. 799). His left-handed grip strength diminished, and he had decreased strength in the dorsal interossei muscles in both hands. *Id.* Dr. Willis was concerned Plaintiff's MS was relapsing. (Tr. 800). She added prescriptions to address the pain and recommended therapy to improve hand strength. *Id.*

Later in March 2016, Plaintiff was hospitalized with hyperglycemia, which was prompted by his steroid usage. (Tr. 873). He was discharged the next day after his blood sugar level stabilized. (Tr. 820).

In June 2016, Plaintiff returned to a nurse practitioner for pain management care. (Tr. 579). On examination, Plaintiff had an unsteady gait with a cane, and numbness in his fingers, toes, and lips. (Tr. 581). Plaintiff had diminished limb strength and the nurse practitioner prescribed hydrocodone-acetaminophen. *Id.*

Opinion Evidence

In February 2015, State agency physician Leon Hughes, M.D., reviewed Plaintiff's physical health records. (Tr. 75-78). Dr. Hughes opined Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand or walk for about six hours in an eight-hour work day, and sit for about six hours in an eight-hour work day. (Tr. 76). He also opined Plaintiff could occasionally push, pull, handle, finger, feel, and operate hand controls. (Tr. 76-77). Plaintiff could frequently balance and climb ramps and stairs, but never crawl or climb ladders, ropes, and scaffolds, Dr. Hughes opined. (Tr. 76). He further opined Plaintiff needed to avoid even moderate exposure to vibration, along with all workplace hazards and commercial driving. (Tr. 77-78).

In May 2015, Lynne Torello, M.D., a State agency physician, reconsidered Plaintiff's records. (Tr. 113-15). She added restrictions to the prior State agency opinion, opining that Plaintiff could only occasionally stoop, kneel, or crouch, which were previously not restricted. *Compare* Tr. 114 *with* Tr. 76. She opined Plaintiff could frequently handle with both hands, compared to Dr. Hughes's opinion which restricted Plaintiff to occasional handling. *Compare* Tr. 115 *with* Tr. 77.

<u>VE Testimony</u>

A vocational expert appeared and testified at the hearing before the ALJ. (Tr. 59-66). The ALJ asked the VE to consider an individual with Plaintiff's age, education, and work experience, who was limited in the way the ALJ determined Plaintiff was. (Tr. 14, 60-61). The VE testified such an individual could not perform Plaintiff's past work but could perform other jobs in the national economy such as an electronics worker, inspector and hand packager, and a laboratory sample carrier. (Tr. 61).

<u>ALJ Decision</u>

In his October 3, 2016 decision, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through June 30, 2014, and had not engaged in substantial gainful activity since his alleged onset date of December 5, 2012. (Tr. 12). He had severe impairments of MS and diabetes mellitus with neuropathy but these impairments did not meet, or medically equal, the severity of a listed impairment individually or in combination. (Tr. 12-14). After consideration of the record, the ALJ concluded Plaintiff had the residual functional capacity ("RFC") prior to March 1, 2015 to:

> perform light work as defined in 20 C.F.R.404.1567(b) and 416.967(b), except that he was limited to frequent use of hand controls bilaterally; frequent handling, fingering and feeling bilaterally; frequent climbing of ramps or stairs and balancing, and never crawling or climbing of ladders, ropes, or scaffolds. He was further limited to no exposure to unprotected heights or moving mechanical parts and occasional vibration. He could not drive a commercial vehicle.

(Tr. 14). The ALJ found Plaintiff had a similar RFC after March 1, 2015, except that Plaintiff then could only occasionally handle, finger, and feel bilaterally, occasionally climb ramps or stairs and balance, and needed a cane to move or stand. *Compare* Tr. 17 *with* Tr. 14.

The ALJ then concluded Plaintiff was unable to perform any past relevant work. (Tr. 18). However, considering Plaintiff's age, education, work experience, and both RFCs, he could

perform other jobs that exist in significant numbers in the national economy. (Tr. 19). Therefore, the ALJ concluded Plaintiff was not disabled from his alleged onset date of December 5, 2012, through the date of his decision. (Tr. 20).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff argues the ALJ failed to properly consider the State agency physician opinion evidence in formulating his RFC at Step Four, and that the ALJ erred in finding sufficient jobs remained that Plaintiff was capable of performing at Step Five. (Doc. 13, at 16-22). The Commissioner argues the ALJ properly evaluated the opinions, and the ALJ's decision is

supported by substantial evidence. (Doc. 14, at 10-21). For the reasons discussed below, the undersigned reverses the Commissioner's decision and remands for further proceedings.

Two State agency physicians provided the only opinion evidence in the record. (Tr. 16, 69-81, 95-106).[3] In February 2015, Dr. Hughes provided an initial opinion. (Tr. 69-81). In May 2015, Dr. Torello provided a second opinion, altering some of the restrictions Dr. Hughes initially opined. (Tr. 95-106). The ALJ issued two RFC statements, one for the alleged onset date through March 1, 2015 (Tr. 14) and a second for March 2, 2015, through the date of the decision (Tr. 17). In formulating the first RFC, the ALJ explicitly discussed both doctors' opinions, assigning partial weight to Dr. Hughes's February 2015 opinion and great weight to Dr. Torello's May 2015 opinion. (Tr. 16). Then, in formulating the second RFC, the ALJ assigned greater weight to Dr. Hughes's February opinion and did not discuss Dr. Torello's opinion. These facts provide the broad outline for Plaintiff's various arguments against the ALJ's treatment of these two opinions.

First, Plaintiff argues the ALJ failed to evaluate both opinions properly under relevant precedent. (Doc. 13, at 17-18). Second, Plaintiff argues the ALJ erred by omitting (and failing to explain the omission of) restrictions from the State agency physicians' opinions to which he gave weight previously in his decision. *Id.* at 16-17. Third, Plaintiff argues the ALJ erred by assigning additional weight to an opinion based on medical records created after the opinion was issued. *Id.* at 18-19. Fourth, Plaintiff argues the ALJ impermissibly failed to consider Dr. Torello's opinion when developing the second RFC. *Id.* at 19. The undersigned addresses each of these arguments in turn.

---

3. Both State agency physician opinions are duplicated in the record at Tr. 82-95 and Tr. 107-118. Only one copy of each is cited herein.

The ALJ is required to weigh non-treating medical source opinions "based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)). In this case, there is no treating source opinion to be deemed controlling, so the ALJ is required, under *Gayheart*, to weigh the State agency opinions. Although the ALJ need not provide "good reasons" for the weight assigned to non-treating source opinion, the findings made must still be supported by substantial evidence. *Jackson v. Comm'r of Soc. Sec.*, 2015 WL 5634671, at *8 (S.D. Ohio 2015) ("Thus, the procedural requirement that the ALJ must give "good reasons" in his decision for the weight it gives a claimant's treating source does not apply to nontreating sources.") (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)).

<u>Dr. Hughes and his first RFC</u>

The ALJ, in assessing Dr. Hughes's opinion in conjunction with the first RFC, offered a brief assessment of the opinion.

> With regard to the opinion evidence, State agency medical consultant Leon D. Hughes, M.D., determined that the claimant was limited to light exertion. He was further limited to occasional pushing and pulling and hand controls, frequent balancing and climbing of ramps or stairs; unlimited stooping, kneeling, and crouching; and never crawling or climbing ladders, ropes, or scaffolds. He was limited to occasional handling, fingering and feeling bilaterally. He had to avoid even moderate exposure to vibration and all exposure to hazards (Exs. 3A/8-9; 4A/8-9). His assessment is given partial weight. Although it is generally consistent with documented neuropathy in the claimant's extremities, the limitation on manipulative activities is more extreme than the limited documentation warrants during the period ending March 1, 2015.

(Tr. 16).

Plaintiff argues the ALJ ignored two relevant medical records that support Dr. Hughes's opinion which, if considered, would have required the ALJ to assign the opinion greater weight.

(Doc. 13, at 16-18). Further, he contends, this paragraph is the only assessment of Dr. Hughes's opinion and is the sort of conclusory opinion that other courts have rejected. (*Id.* (citing *Hollon v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 577, 584 (S.D. Ohio 2015)[4])). The Commissioner argues the ALJ permissibly discussed these records elsewhere in his opinion and is not required to repeat himself. (Doc. 15, at 17). For the following reasons, the undersigned finds the ALJ did not err in his evaluation of Dr. Hughes's opinion in relation to the first RFC.

Plaintiff points to two sets of medical records he contends were not discussed by the ALJ: one describing abnormal test results in August 2014 (Tr. 320-21) and another describing motor weakness and decreased sensation and grip strength in October 2014 (Tr. 351). (Doc. 13, at 18). However, the ALJ discussed both earlier in the opinion. *See* Tr. 16 ("He was initially assessed with a spinal cord tumor with clinical signs of myelopathy (Exs. 2F/5-7 [Tr. 319-321], 19; 3F/9)."); *see also id.* ("An October 2014 examination showed decreased sensation to soft touch and motor weakness and decreased grip strength in upper extremities. However, the rest of the examination revealed normal results. He had clear lungs, a regular heart rhythm and rate, no musculoskeletal deformity (Ex. 3F/14 [Tr. 351])."). While the ALJ is required to consider every piece of medical evidence, he is not required to cite everything he considered. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party. Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts.") (quoting *Loral Defense Systems–Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999). The ALJ is also not required to

---

4. Plaintiff block-quotes *Hollen*, an out-of-district case, while attributing the quote to *Gayheart*, a binding Sixth Circuit decision. *See* Doc. 13, at 17.

repeat discussion of each piece of medical evidence when evaluating a medical opinion. *See, e.g., Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016). In this case, the ALJ permissibly discussed the relevant medical evidence earlier in the opinion. He discounted Dr. Hughes's opinion based on limited documentation of Plaintiff's manipulative restrictions, while acknowledging some documented muscle weakness that supported a less restrictive RFC than the restrictions Dr. Hughes noted. (Tr. 16). This is supported by evidence cited by the ALJ. *Id.* (citing Tr. 320 (August 2014 records showing Plaintiff scored 5/5 on a motor strength test); Tr. 351 (October 2014 records showing decreased hand strength and sensation)). Therefore, the ALJ complied with the procedural requirements by evaluating medical evidence earlier in the opinion, and permissibly discounted Dr. Hughes's opinion based on limited documentation. (Tr. 16). Therefore, the undersigned finds no error in the evaluation of the opinion evidence as it relates to the first RFC.

<u>Hand Control Restrictions</u>

Both State agency physicians included hand control restrictions in their opinions, which were not included in the ALJ's opinion. (Tr. 16, 89, 102). The ALJ is responsible for determining a claimant's RFC based on all relevant evidence. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Even when opinion evidence receives significant weight, the ALJ does not have to adopt any RFC determinations verbatim. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides "great weight" to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinion verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale."). An ALJ can consider all the medical opinion evidence without directly addressing every piece of evidence in the opinion. *See Kornecky*, 167 F. App'x at 508.

Importantly, however, if a medical source's opinion contradicts the ALJ's RFC finding, an ALJ must explain why he did not include the medical source's limitation in his determination of the claimant's RFC. *See* SSR 96-8p, 1996 WL 374184, at *7. Social Security Ruling 96-8p provides: "The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.* Courts in the Northern District of Ohio have held that an ALJ's failure to comply with this regulation requires reversal. *See Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (ALJ's failure to address a medical source's opinion which conflicted with RFC constituted reversible error); *Thompson v. Comm'r of Soc. Sec. Admin*, 2014 WL 356974, at *4 (N.D. Ohio) (remanding because ALJ did not explain why she failed to adopt in the RFC a conflicting limitation assigned by medical sources); *Moretti v. Colvin*, 2014 WL 37750, at *10 (N.D. Ohio) (remanding because ALJ failed to explain why she did not include in the RFC a limitation assigned by a medical source).

Here, both State agency physicians found Plaintiff restricted to occasional use of hand controls bilaterally, while both RFCs permitted frequent use. (Tr. 14, 17, 76, 102). Again, while the ALJ is not required to adopt restrictions provided by a State agency opinion, assigning the opinion partial or great weight and then not explaining, either explicitly or through an indirect attack, why a restriction in that opinion is not included in the ultimate RFC is reversible error. *See* SSR 96-8p, 1996 WL 374184, at *7.

*First RFC*

In conjunction with the first RFC, the ALJ noted that, although Dr. Hughes's opinion was generally consistent with the record evidence, "the limitation on manipulative activities is more extreme than the limited documentation warrants during the period ending March 1, 2015." (Tr.

16). The ALJ also gave great weight to Dr. Torello's opinion for being "generally consistent with the limiting effects of the claimant's newly diagnosed multiple sclerosis and his ongoing diabetic neuropathy." *Id.* Both of those doctors' opinions restricted Plaintiff to occasional use of hand controls. (Tr. 76, 102). The ALJ explicitly assigned less weight to Dr. Hughes's opinion because he found the manipulative restrictions not fully supported by the record. (Tr. 16). That sentence makes clear the manipulative restrictions Dr. Hughes found, which limited Plaintiff to occasional handling, fingering, and feeling, were not deemed fully credible by the ALJ and allows the Court to understand why the first RFC is less restrictive than Dr. Hughes's opinion.

However, Dr. Hughes's restriction to only occasional use of hand controls is found in his discussion of Plaintiff's *exertional* limitations, along with restrictions to occasional pushing and pulling, and not in his assessment of Plaintiff's *manipulative* limitations. *See* Tr. 76-77. Dr. Torello's exertional limitations opinion is identical to Dr. Hughes's. *Compare* Tr. 76 *with* Tr. 102. Although the ALJ only explicitly noted a lack of support for Dr. Hughes's manipulative restrictions, the symptoms causing the restrictions overlap sufficiently to allow the Court to understand why the restriction was left out of the ALJ's first RFC. Plaintiff's exertional limitations (including use of hand controls) were due to decreased grip strength and sensation in his hands and motor weakness in his arms, Dr. Hughes opined, and his manipulative limitations were due to decreased grip strength, sensation, and strength. (Tr. 76-77). By discussing manipulative restrictions, the ALJ indirectly addressed the exertional restriction regarding hand controls because Dr. Hughes opined both sets of limitations were caused by virtually identical symptoms. Courts have permitted an indirect attack on a treating source's opinions, and logically such an indirect attack is also permissible while evaluating State agency physicians, who did not examine the plaintiff and are entitled to less deference from an ALJ. *See Smith v. Comm'r of Soc. Sec.*, 482

F.3d 873, 875 (6th Cir. 2007); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) ("If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

The ALJ did not address why Dr. Torello's opinion restricting Plaintiff to only occasional use of hand controls was left out of the first RFC. However, because Dr. Torello's opinion is identical to Dr. Hughes's on this particular issue, any error is harmless. An error is not harmless when remand might lead to a different outcome. "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result." *Kornecky,* 167 F. App'x at 507. In this case, remand to further address Dr. Torello's opinion would not result in a different outcome, because the ALJ effectively considered her opinion by also considering Dr. Hughes's opinion on this particular issue. When "remand would be an idle and useless formality, courts are not required to convert judicial review of agency action into a ping-pong game." *Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (internal quotation omitted).

*Second RFC*

However, the undersigned must reverse and remand the Commissioner's decision for reconsideration of the opinion evidence in conjunction with the second RFC. In making the second RFC determination, the ALJ only discussed Dr. Hughes's opinion. (Tr. 17). He found Dr. Hughes's February opinion deserved greater weight beginning March 2, 2015 because "the evidence shows

worsening problems with fatigue and motor strength during this period." (Tr. 18). The ALJ did not discuss Dr. Torello's opinion in this section of the opinion.[5]

Problematic, is the ALJ's failure to incorporate the State agency physicians' occasional use of hand controls restriction and that he offered no evidence to permit this Court to understand why that restriction was not included. While a court typically can look elsewhere in the opinion for that information, the ALJ put a hard end-date on his evaluation of Dr. Hughes's opinion in the earlier section, preventing the undersigned from reviewing previous assessments of the evidence. (Tr. 16) ("…the limitation on manipulative activities is more extreme than the limited documentation warrants during the *period ending March 1, 2015*.") (emphasis added). Most of Dr. Hughes's restrictions were more severe than the initial RFC but aligned closely with the later RFC, which explains why the ALJ gave Dr. Hughes's opinion greater weight. But there is no discussion of Dr. Hughes's restriction to occasional use of hand controls, nor an explanation for why the ALJ's RFC determination deviated from an opinion given great weight. Therefore, the undersigned remands the opinion for further consideration of Dr. Hughes's opinion for the period beginning March 2, 2015.[6]

---

5. Failure to discuss Dr. Torello's opinion for this time frame is harmless error, because the ALJ's RFC was more restrictive than any restrictions offered by Dr. Torello that also differed from Dr. Hughes's opinion. In not discussing Dr. Torello's opinion explicitly, the ALJ either addressed each individual limitation by addressing the same opinion offered by Dr. Hughes or found a more restrictive RFC that would benefit Plaintiff, with the notable exception of both State agency physicians' opinion that Plaintiff could only occasionally use hand controls. Therefore, the missing discussion could not have any prejudicial impact on the ALJ's ultimate disability determination. *Kornecky*, 167 F. App'x at 507.

6. While not necessarily an independent cause for remand, the undersigned encourages the ALJ to reconsider or better explain the rationale underlying assigning great weight to a May 2015 opinion for a time period ending on March 1, 2015, while giving greater weight to a February 2015 opinion for a time period beginning on March 2, 2015.

<u>Step Five</u>

Any reconsideration of Plaintiff's RFC may impact the hypotheticals provided by the ALJ to the VE. Therefore, the undersigned declines to consider the arguments raised by Plaintiff concerning the number of jobs available in the national economy.

C<small>ONCLUSION</small>

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI not supported by substantial evidence, reverses that decision, and remands for further proceedings consistent with this opinion under Sentence Four of 42 U.S.C. § 405(g).


 s/James R. Knepp, II
United States Magistrate Judge